Good morning, your honors, and may it please the court. My name is Michael Morgan. I represent the United States on this appeal. Approximately four months after the indictment was returned in this case, the complaining witness was diagnosed with terminal pancreatic cancer. The government promptly moved to preserve her testimony in a Rule 15 deposition. That deposition was held on September 22nd of 2010. The deposition itself lasted over four hours, during which the complaining witness was subject to thorough and extensive cross-examination by defense counsel into areas including not only her allegations against the defendant, but also various other areas that may or may not have been relevant to the victim's reliability, credibility, etc. Shortly after that deposition, the government moved for a superseding indictment. During the deposition, the complaining witness had shown some uncertainty as to the dates of the various offenses alleged in the indictment, and the disparity was not that great, frankly, especially given the nature of the allegations and the mental capacities of the complaining witness. The complaining witness was a developmentally disabled woman who couldn't possibly be expected to remember exact dates and times of events that took place two years prior to the deposition. In any event, the government moved to supersede the indictment. The only difference in the indictment was an expansion of the timeframes alleged to each count. The locations of the various alleged offenses were exactly the same, and critically, during her deposition, the complaining witness testified specifically as to those various locations as to where these events took place. In short, the defendant was completely on notice of the charges against him, the nature of the charges against him, and he had a full opportunity to cross-examine the complaining witness about those allegations. How much was known about the status of her medical condition at the time you moved for the deposition? Of her medical condition or her mental condition? Medical. Oh, her medical condition. Well, we knew she had pancreatic cancer, and as the government indicated in its declaration submitted in support of the Rule 17 deposition, we knew that she was taking medication for pain because unsurprisingly, she was in great pain from her condition. The government did not know what medication she was taking, but the government had any of the lawyers, any of you or any of your associates met with the doctors or just talked with the doctors? No. As far as I'm aware, no one had actually talked to the doctors. We had spoken with the complaining witness, and we may have spoken with her victim's advocate, but there was no consultation with the doctors as far as I'm aware and certainly not as far as the record reflects. In any event, the defendant was well on notice that the complaining witness was taking pain medication. They had three weeks prior to the deposition. If they thought that was an area of inquiry to seek to subpoena her medical records or even to ask the government to try to get those medical records, if they thought they really needed to question her about that, and they did not. At the deposition, moreover, the complaining witness was asked one of the first questions asked to her, are you taking medication? Yes, I am. Does this medication affect your ability to tell the truth? No, it does not. Does this medication affect your memory? No, it does not. While defense counsel may not have known the precise medication she was taking, he could have asked. He never did. He could have asked the complaining witness, even if you don't know what medicines you're taking, how do they affect your memory? Do they affect your memory? What side effects at all do you experience from them? So, not a single question was propounded to the witness about this. So, for the defense to later claim, after the victim has died, that they were precluded from examining the witness about that topic. So, not long after the deposition, the records show that she gets her medical condition, begins to deteriorate, they remove her from, they either add to her medication or they remove some of the medication? Your Honor, I think Your Honor is referencing the September 29th treatment note, which indicates that at that time she had actually been removed from all medications, except medications for pain, nausea, and itching. So, the laundry list of medications that defense counsel provided to the district court was somewhat misleading to the extent that the victim, or the complaining witness rather, was not on all of those medications. She was only on medications for pain, nausea, and itching. So, when did those med notes become available to either the government or to the defense? The September 29th treatment note was, half of it was disclosed in December. Due to a copying error, the even number pages weren't actually disclosed. The even number pages, which unfortunately for everyone had most of the pertinent information, was disclosed in, I want to say, late March. Again, about a month after the complaining witness had died. So, in December, did the defense have those partial? No, they had partial records, but in fairness to the defense, they didn't have the records that they believe were pertinent to what they wanted to question the witness about. But I think that raises a key point, Your Honor, is that they purportedly wanted to question the complaining witness about these medical records, but she simply wasn't competent to testify about them. They don't contain any statements from her. They're simply statements of the treatment providers. She is simply not competent to testify about some treatment provider's opinion of her care, of her mental status, of her condition. The proper witness to testify about that is the treatment provider. I could ask her, you know, whether she was taking them on a regular basis. Your Honor, you're absolutely right. They could have and they didn't. Did it make her sleepy after she took them? Sure. They absolutely could have and they did not. And again, this is important. With respect to the medication issue, the record leaves no doubt that the defense was on notice three weeks prior to this deposition that the complaining witness was taking these medications. And under the law of this circuit, it is established that if a victim is subject to cross-examination in one proceeding, in this case the Rule 15 deposition, and let's be clear, when that Rule 15 deposition was over, that was as if she had been released from the witness stand. That's the whole point of a Rule 15 deposition. It is effectively her trial testimony. And the defense later discovers information that may or may not have impeaching value. That fact does not preclude the introduction of that previously cross-examined testimony in a subsequent proceeding. The trial hadn't taken place yet. The trial had not taken place. If she had still been alive at the time of the trial and capable of testifying, she would have been on the stand. She absolutely would have. Correct. She absolutely would have. But the fact is she was not. The fact is she died. Was it a mistake for the district court to order a second deposition? In my opinion, yes, it was, Your Honor. But in fairness to the district court, while the government had represented at the hearing on that that her condition had deteriorated greatly, she had had a heart attack a week previous to the hearing. We did not know and we did not tell the district court that she was effectively comatose at the time. Had the district court known that, I have no doubt that Judge Settle would not have ordered a deposition of her at that point. I think even the judge with hindsight recognized it had been a mistake to order that second deposition. So I think that the fact Is that because of her condition? Yes. There was nothing in the rule that precludes a second deposition. No, there's absolutely nothing in the rules that precludes a second deposition. But to order a second deposition that would have been pointless, I think that this would be an abuse of discretion. I mean, you Sure. Did the district court have the transcript, the video of the first deposition? I know that the district court had the video. It seems like she's in a lot of pain. It does seem like she's in a lot of pain. Is the district court aware of that? I know the district court had the transcript in front of it. I can't represent that the district court, in fact, had the video. The district court indicated it had read the transcript. It had never indicated that it had watched the video. But I agree with your Honor. If you watch that videotape, the complainant witness is in great pain. But I also think if you watch that videotape, it is crystal clear that she knows exactly what's going on. She's completely competent. She's testifying appropriately. She's emotionally appropriate in her testimony. And while she may be confused on some. Counsel, I have watched the video. And I think you may be overstating how clear and unconfused she is. She gets herself wound up in contradicting places and locations and time. So I'm not sure you want to sell your case on how competent she was. I think the greater issue, at least from my perspective, is whether the defense had an adequate opportunity to confront her on the allegations. And I have a hard time seeing why they didn't on that video. So I'm not quite sure what the Judge Settle was concerned about in terms of a confrontation presentation. So that's my concern in the case. Yes, Your Honor. And I agree that she showed some confusion, especially with regard to dates. But she was crystal clear in her allegations that these encounters were entirely nonconsensual. And she was consistent with where they occurred. She might have mixed up. And, in fact, she didn't mix up in her testimony. Her testimony might have been inconsistent with some prior statements about the ordering. But, again, the location issue was, I think, very clear. I see that I'm over time. Mr. Morgan, yes, your time's up. We'll give you a minute of rebuttal. Thank you, Your Honor. And, of course, as long as any judge is asking questions, you can continue. Okay, Mr. Leonard. Mr. Leonard's been here before. He knows how to work our podium. Good morning, Your Honors, and may it please the Court. Russell Victor Leonard, as well as John R. Carpenter of the Federal Public Defender in Tacoma, here on behalf of Robert Underwood, Jr. This case is unlike Kuhn and Thomas, the cases cited by the government, where there were two separate proceedings. And after the first proceeding had been completed, either by a jury verdict or a hung jury, additional impeachment material. Well, this was a deposition that was intended for the purpose of preserving her testimony in the event of her death, correct? That is correct, Your Honor. Were any limitations imposed upon you on the scope of that examination? There were no limitations. Free to go at it. That's true. And you did? Well, I guess I felt like I did my best, but we're not at the stage of proceedings where this is a referendum on how good I did. No, but it was a pretty thorough cross-examination, correct? I don't believe it was thorough enough in particular. Why not? In light of the additional information that was provided to the defense after the deposition, but before the trial had even commenced, Judge Settle ordered additional examination of the witness and clearly was within his discretion. You knew that she was quite ill. We did know that she had pancreatic cancer, correct? We did know that, yes. You didn't think she was taking any meds? We were advised that she was taking pain medication, and the first question that the government asked was, are you taking medication? She said, yes, and that it wasn't affecting her. Did anybody foreclose you from following up on your own series of questions? No, there was no limitation on that, but what I would note is that later the witness apparently, according to Mr. Miyake's declaration during the course of the motions being litigated, that the witness hadn't taken her medication that morning, so her first statement that she was on medication and that it wasn't affecting her was really incorrect based on the statements made by Mr. Miyake. Counsel, what has that got to do with anything? You had an opportunity to confront her on the charges, and you, as Judge Paez was suggesting, could have pursued as much as you want how confident she was in terms of medication. What I have trouble understanding is what it is on a second deposition that you would have gotten from her that you don't already have on the videotaped deposition. You've got all of her demeanor. You've got all of her answers. The jury can look at the deposition, assess her as if she were on the stand. I'm not at all clear what a second deposition would have gained you, other than to say that you caught her in a later stage of her disease and you wanted to ask her about medications, which she was now taking at that point. That is not something that, aside from her demeanor on the witness stand, you could have advanced your case very much with without going into medical evidence, and that medical evidence is available to you to impeach her testimony now through doctors and whatever else. So I don't understand a confrontation clause issue here at all. The issue, Your Honor, is that Judge Settle found that there were additional critical areas of examination that the defense ought to have been allowed based on the additional information received before this proceeding had even begun. So based on her mental incapacity. Additional areas such as what? Medical records related to her mental incapacity, her taking of medication, and her impaired memory. I thought that was included in my statement about my concern about this case. That is, you have her on videotape. It is known that she was dying. It is known that she was on medication. The degree of medication is not something that you went into as much as maybe you should have, but I'm not going to fault you for that. The point is that the medication issue and her competency issue would have been demonstrated or can still be demonstrated by evidence about the medications and the likely effects on her, and the jury would have the videotape to understand how she was behaving and performing at the time of the deposition, which was going into the substance of the charges. Now you're talking about having a deposition about a dying woman as to how competent she would have been at the second deposition where the focus was the degree of medication she had at that point. Again, I don't see a confrontation issue. Your Honor, I disagree. The defense would have been – well, we don't know how the witness would have responded to the questions that the defense would have asked at a second deposition and speculating that it would have been futile or she wouldn't have been able to respond to these things. It's purely that speculation by the government. The defense provided the trial court after the witness's death with an offer of proof of additional questions that they would have asked at that second deposition, and this is at the sealed ERs, page 34 through 40, that show the scope of what we would have hoped to accomplish in terms of confronting this witness with additional information about her medical condition, her medications, and her impaired memory.  You still would have – as I understand Judge Settle's ruling, he only excluded her testimony and dismissed his case on the basis of the Sixth Amendment, right? Yes, Your Honor. Lack of confrontation? The fact is – There were other arguments that you advanced, as Judge Fisher has alluded to. That's true. Right? And so those arguments are still available. There are several remaining arguments that were not settled by Judge Settle, but what I would note is that Judge Settle – this is a situation where the judge is most analogous to a witness being called to the stand, both parties questioning that witness, the witness being excused, the trial continuing. During the course of the trial, additional information about a critical area of impeachment becomes known to the parties in the court. The defense requests an opportunity to recall the witness and question the witness about these additional critical areas of cross-examination, and then the defense is precluded from that for really whatever reason, whether it's the witness taking the Fifth Amendment, refusing to testify, refusing to come to court, or even dying. So we were not able to ask about these critical areas of impeachment, and we will never know what the answers are. And certainly I understand Your Honor's point about excusing. Counsel, if I could ask you a question. The court, though, never excluded any testimony. There was never any restriction on the scope of the examination. You were unable to ask further questions because she passed away. That is correct. But the cases that relate to like a limitation on scope of cross at trial, for example, I don't quite see how those apply. The cases that we cite I think support the proposition that if there is additional cross-examination that is warranted, critical area, that the inability of the defense to answer that in the middle of the first proceeding is entirely appropriate for the court to exercise its discretion in ordering that examination and striking the testimony if it cannot be had. But this is a little bit different, though. I mean, this was a deposition that was taken for the sole purpose of preserving her testimony, knowing full well that she may not be alive at the time of the trial. That's correct, Your Honor. So, I mean, like Judge Fischer, I don't fault you on the way in which you conducted the cross-examination during the deposition, but everybody knew going in the whole purpose of that was to preserve her testimony. Because there was a fair chance of her life expectancy that she wouldn't be around at the time of the trial. That's correct, Your Honor. I would also note that everyone was surprised by the diminished ability of this witness to even follow questions, let alone answer questions. Well, you know, again, as I was asking the government counsel, it was well known that she had pancreatic cancer, right? Yes. That's a pretty serious condition. Absolutely, Your Honor. There was less known about the extent of her mental incapacity or impairments, and those were emerging through the course of the deposition, and perhaps a better lawyer than me would have been quicker on his feet. In any event, after that deposition, when the parties started discussing what's going on here, even the government recognized that there may be need for a mental evaluation, and they held out the prospect of that mental evaluation all the way, of conducting it themselves and providing the results to the defense and the court. They held out that prospect all the way until February 9th. It is only then that the government withdrew the notion that it would conduct its own mental evaluation, and it was at that stage that Judge Settle ordered a second deposition and was also on the verge of ordering a compelled mental examination. You know, an important part of the context of this, again, showing how unusual and how the posture of this case was unlike any that the parties or the court had encountered. I think the court exercised his appropriate discretion in ordering additional cross-examination and then striking the deposition testimony based on the government's concession that they could not proceed without it. Okay, thank you, Mr. Lennon. Thank you, Your Honors. Thank you. Go ahead, Mr. Lennon. I do have one response. Give your colleague an extra minute. I appreciate that. I appreciate that, Your Honors. One of the government's arguments in reply is that essentially the judge, Judge Settle, was mistaken about his interpretation of his ruling. The defense provided the court with a 28-J letter. I know the court has a motion before it related to that letter, but whether the court accepts our letter or not, it certainly is uncontrovertible that a trial court judge is in the best position to explain its own orders and the interpretation of those orders. So we would say the government's argument that Judge Settle was somehow mistaken or misapprehended the true meaning of his ruling on February 9th in explaining that ruling in April two months later or October, that that just is not a meritorious argument. Thank you. Thank you, Mr. Lennon. Okay, Mr. Morgan. Thank you, Your Honors. Very briefly. Could you address counsel's position about the mental evaluation that the government was suggesting would be required? Yes, Your Honor. And the government's position is laid out in Supplemental Excerpt for Record, page two. The government considered having the complaining witness evaluated, but not because the government had any concerns about her competency. The government simply wanted to have a mental health expert evaluate her to explain perhaps how her diminished mental state might have affected the delay in reporting these incidents, because that was one of the areas that the defense brought out during the deposition, was that she had various opportunities to report this and didn't, and the government wanted to have a mental health expert explain why her delayed mental state may have affected her decision to report. It had nothing to do with whether or not the government had any doubts about her competency, and the record is crystal clear on that point. With respect to the terms of the judge's order, respectfully, the terms of the judge's February 9th order speak for themselves. And finally, as the court has recognized, the defense had a full opportunity to cross-examine the complaining witness about any and all topics. They exploited that to the best of their ability, based on all the information they had, and none of the information they later discovered, there's no allegation it was suppressed by the government. Under these facts, the confrontation clause was completely satisfied. Unless the court has any further questions, we'd ask that the judgment be reversed. Any other questions? Hearing no questions. Thank you. Thank you, Your Honor. The case of United States v. Underwood shall be submitted.
judges: Fisher, Gould, Paez